IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NORMA BIELICH,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| v. ) | Civil Action No. 11-1635 |
| ) | |
| ) | |
| **JOHNSON & JOHNSON, INC. t/d/b/a** ) | |
| **ETHICON, INC.,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

**CONTI, Chief District Judge.**

        This is an employment discrimination case. Pending before the court is a

motion for summary judgment (ECF No. 45) filed by defendant Johnson & Johnson, Inc.

t/d/b/a Ethicon, Inc. ("Ethicon") seeking judgment as a matter of law against plaintiff

Norma Bielich ("Bielich") with respect to all claims asserted in her first amended

complaint. (ECF No. 14.) In her fourteen-count complaint, Bielich claims that Ethicon

a) treated her less favorably due to her gender and disability, b) failed to accommodate her

disability, c) subjected her to a hostile work environment based on her disability, and d)

subjected her to retaliation based upon her request for an accommodation. Bielich asserts

claims pursuant to Title VII, 42 U.S.C. §§ 2000e – 2000e-17 ("Title VII"), the Americans

with Disabilities Act, 42 U.S.C. § 12101 – 12117 (the "ADA"), the Rehabilitation Act, 29

U.S.C. § 701 – 718 (the "RA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951

– 963 (the "PHRA").   Bielich seeks monetary relief, including punitive damages and attorneys' fees, as well as unspecific injunctive relief against Ethicon.

This court exercises subject-matter jurisdiction over Bielich's federal claims pursuant to 28 U.S.C. § 1331, and over her state-law claims under the PHRA pursuant to 28 U.S.C. § 1367(a) and 42 U.S.C. § 2000e-5(j)(3).

For the reasons set forth below, the court finds that Ethicon's motion for summary judgment must be granted, in part, and denied, in part.   The only claims triable to a jury are the failure to accommodate claims Bielich asserts under the ADA and the PHRA.

## I.  Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to Bielich.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   Other undisputed facts may be discussed in the context of each of Bielich's legal claims where appropriate.

### A.  Bielich's Employment and Performance History at Ethicon

Plaintiff was hired by Ethicon in 1998 as a field sales representative and was promoted to the position of professional education manger in 2006. (ECF No. 63 ¶ 1.)   As a professional education manager, Bielich a) planned, coordinated, and facilitated professional education events, b) recruited, contracted, trained, and administered consultants, and c) attended meetings, provided status reports, and managed communications from sales personnel. (Id. ¶ 2.)   At the time she was hired, Bielich was qualified for the position. (Id. ¶ 80.)   It is disputed that Bielich remained qualified for the position if she suffered from the limitations that she articulates in the summary judgment submissions. (Id.)

In May 2009, Michael Willick ("Willick") became Bielich's supervisor. (Id. ¶ 10.) Prior to this time, Willick had been Bielich's peer on the professional education team, and Andrew Hart ("Hart") supervised them both. (Id.) After Willick's promotion, the other members of Bielich's professional education team were Rick Summerlin ("Summerlin") and, later, Timothy Mauri ("Mauri"). (Id. ¶ 11.) In August 2009, Mauri joined the professional education team because the workload being carried by Summerlin and Bielich resulted in them both "working extraordinarily hard and long hours." (Id. ¶¶ 11, 72, 110.) All members of the team worked remotely from different locations throughout the country. (Id. ¶ 12.) Bielich worked from her home in Pittsburgh, Pennsylvania. (Id.) By July 2009, Bielich reported to Willick, Willick reported to Richard Merklinger ("Merklinger"), Merklinger reported to David Bourdeau ("Bourdeau"), the group director of Worldwide Professional Education, and Bourdeau reported to Sandra Humbles, the vice president of Global Education Solutions. (Id. ¶ 15.)

On April 24, 2009, while still her supervisor, Hart gave Bielich an annual evaluation of her 2008 job performance. (Id. ¶ 13.) During this evaluation, Bielich was told that she was not meeting expectations, that her performance was not acceptable, that she would be placed on a sixty-day performance development plan, and if she was still not meeting expectations would then be placed on a ninety-day performance improvement plan. (Id. ¶¶ 13, 16; ECF No. 48-1 at 18; ECF No. 52 at 35-36.) Hart gave her a numerical rating of 4 out of 10 for her work in 2008. (ECF No. 63 ¶¶ 13, 90.) On Monday April 27, 2009, although she did not have an appointment, Bielich drove from Pittsburgh, Pennsylvania, to the company's headquarters in Somerville, New Jersey, to meet with Bourdeau. (Id. ¶ 14.) Bielich told Bourdeau she was shocked by her poor evaluation,

apologized, and told him she would do her absolute best to improve her performance. (Id.) During this meeting Bielich told Bourdeau that she was confused and exhausted and that she had been struggling, but did not know how to explain it; she did not tell Bourdeau that she was unable to do her job for medical reasons, and did not ask for an accommodation for any disability. (Id. ¶¶ 14, 92.)

On June 19, 2009, Willick, who had recently become Bielich's supervisor, sent the sixty-day development plan to her via email. (Id. ¶ 20.) Bielich reviewed, signed, and faxed back a copy of the plan to Willick on June 22, 2009. (Id.) The sixty-day plan identified two areas where management believed Bielich demonstrated a need for improvement: "sense of urgency" and "collaboration and teaming." (Id. ¶ 21.) Willick and Bielich had several bi-weekly telephone calls during the term of the sixty-day plan to discuss Bielich's progress as compared to the objectives of the plan. (Id. ¶ 24.) During the sixty-day plan period, Bielich received both positive and negative feedback: Willick complimented Bielich on completing certain tasks, but two internal customers and an employee in a different Ethicon department expressed concerns with Bielich's timeliness in completing other tasks and responding to inquiries. (Id. ¶¶ 25-28.)

Bielich met with Willick, in Dallas, Texas, on September 10, 2009, to discuss her performance under the sixty-day plan. (Id. ¶ 33.) Willick informed Bielich that she failed to satisfy the objectives of her sixty-day plan, shared with her negative feedback about her performance that had been submitted by internal customers, and told her that she would be placed on a ninety-day performance improvement plan ("PIP"). (Id. ¶¶ 33, 36.) Internal customers also submitted positive feedback about Bielich during the sixty-day plan period, although Willick did not review positive comments during the

4

meeting. (Id. ¶ 112.) Willick asked Bielich to develop and submit the objectives for her PIP, which Bielich did. (Id ¶ 37.) Bielich submitted her PIP objectives, with relevant deadlines, to Willick via email on October 8, 2009. (Id. ¶¶ 37, 40.) In response, Willick asked Bielich if she "felt comfortable with this plan…that it can be accomplished," to which Bielich answered "It HAS to be accomplished!" (Id. ¶ 38.) Willick reviewed the objectives, along with the deadlines established by Bielich, and approved the PIP. (Id. ¶ 39.) Shortly after the approved PIP was transmitted to Bielich, she extended some of the deadlines, for various reasons, to which Willick did not object. (Id. ¶ 41.) The PIP stated that Bielich's employment could be terminated prior to expiration of the ninety-day review period if, for example, significant and sustained progress was not being made. (Id. ¶ 145.)

During the course of the PIP, Bielich and one of her supervisors, either Willick or Merklinger, met weekly via telephone to review her progress, and Bielich submitted weekly written reports to Willick. (Id. ¶ 42.) Willick sent multiple reminders of deadlines and assignments to Bielich during her PIP, and both Merklinger and he provided Bielich with positive reinforcement during her PIP. (Id. ¶ 46.) It is undisputed that Bielich missed various deadlines set forth in her PIP, and missed deadlines otherwise set by management during this time period for various tasks. (Id. ¶¶ 48-58, 125, 147-51.) Willick was responsible for notifying upper management whether or not Bielich met the requirements of her PIP. (Id. ¶¶ 132-33.)

Willick emailed Merklinger and Lena Tai ("Tai"), a member of Ethicon's human resources department, on December 22, 2009, with a draft letter for terminating Bielich's employment. (Id. ¶¶ 60, 120.) He requested a termination date of January 19, 2010. (Id.) In the draft termination letter, Willick wrote that Bielich was being terminated

for continuing performance deficiencies with respect to demonstrating a "sense of urgency" with respect to meeting deadlines, attaining goals, and for violating Ethicon's standards by discussing personal issues with other employees and making "purely emotional comments" after being directed by management not to do so. (Id. ¶ 127; see sections I.B. and I.C., below.) On January 5, 2010, Willick emailed Tai to finalize arrangements for Bielich's termination and to suggest January 21, 2010, as the date of termination. (Id. ¶ 61.) Violating Ethicon's standards does not appear as a reason for termination in the revised termination letter emailed by Willick to Tai on that date, or in the final termination memorandum. (Id. ¶ 131.)

Willick, Merklinger, and Tai met with Bielich on January 21, 2010, in the Hyatt Hotel at the Pittsburgh Airport to notify Bielich about her termination, effective that date. (Id. ¶ 63.) Willick gave Bielich a memorandum regarding her termination. (Id.; ECF No. 52-7 at 26-28.) The memorandum stated that "you have attempted to do the minimum expected, but your performance has failed to satisfy the performance goals/objectives and you have not demonstrated the [Global Leadership Profile] behaviors that were set forth in your 2009 PIP and Action Plan." (ECF No. 63 ¶ 64.) In the memorandum Willick a) set forth several deadlines that Bielich had missed, b) noted Bielich's admission in a December 11, 2009 email that she had "some catching up to do" and was "behind" on her goals, and c) recounted a complaint that he had received in November 2009 with respect to Bielich's timeliness in arranging reimbursement of a dinner event. (Id. ¶ 143.) Ethicon hired two security guards to be seated outside the room during the termination meeting. (Id. ¶ 140.) When Timothy McGinnis was fired at the Pittsburgh Airport, Ethicon did not hire security guards. (Id. ¶ 141.) Bielich was replaced by a male, Hasan Campbell. (Id. ¶ 152.)

### B. Bielich's Relationship with Dr. Heniford

Between October 2006 until approximately October 2007, Bielich had a consensual sexual affair with Dr. Todd Heniford ("Heniford"). (Id. ¶ 3.) Heniford was an outside consultant and "Key Opinion Leader" for Ethicon. (Id.) Bielich dealt with him on business matters on behalf of Ethicon. (Id.) In late July 2007, Bielich was diagnosed with a sexually transmitted disease ("STD"), HPV, which was asymptomatic and discovered during a routine OB/GYN examination. (Id. ¶ 6.) Bielich attributes contraction of this disease to Heniford. (Id. ¶¶ 45, 122.) On January 2, 2008, Bielich had surgery to remove the HPV, and it has not recurred. (Id.)

Bielich kept her relationship with Heniford a secret until early January 2008, when she told Hart, her then-manager, about the relationship and her contraction of HPV as a result. (Id. ¶¶ 5, 82.) Upon making this disclosure to him, Hart indicated that he had contracted the same STD. (Id. ¶ 129.) Hart recommended that Bielich disclose her relationship to the other team members, at that time, Jennifer Bailey and Summerlin, in order to explain why she would prefer not to be assigned to events involving Heniford; which she did. (Id. ¶ 82.)

In early October 2009, Bielich told her co-worker, Michelle Barczack, about her relationship with Heniford and that she had been diagnosed as suffering from premenstrual dysphoric disorder ("PMDD"). (Id. ¶ 115.) On October 26, 2009, Bielich, Willick, and Merklinger had a conference call to discuss the PIP, during which Bielich was advised that concerns had been expressed to management about Bielich's discussion at work of her relationship with Heniford, her contraction of and surgery for an STD, and her PMDD. (Id. ¶ 44.) According to Bielich, Willick and Merklinger told her "not to share

details of her personal life in order to explain or justify any performance deficiencies" and
that her PIP and personal issues, including PMDD, were "completely separated." (Id. ¶¶
44, 116.)   On December 3, 2009, Bielich told a co-worker, Dan Patterson, about her
previous relationship with Heniford and that he had given her an STD. (Id. ¶¶ 45, 122.)
Willick became aware of this disclosure and told Bielich that Tai would be discussing the
matter with her. (Id. ¶¶ 122-23.)   After that time, Bielich contends that Willick became
less supportive of and nice to her, and was "very angry" with her. (Id.)   Tai addressed the
matter with Bielich during an in-person meeting on December 15, 2013, by chastising her
for what she characterized as unprofessional behavior. (Id. ¶ 124.)

### C.   Bielich's Disclosure of Medical Condition

On June 1, 2009, Bielich was diagnosed as suffering from PMDD. (Id. ¶ 74;
ECF No. 52-7 at 8.)   PMDD is classified as a mood disorder, and causes Bielich to
experience chronic fatigue, difficulty concentrating, feelings of despair and mental
paralysis, bouts of uncontrollable crying, and suicidal thoughts. (ECF No. 63 ¶¶ 75, 76.)
These episodes last about two weeks each month. (Id. ¶ 76.)   PMDD limits Bielich's brain
function, by causing her to lose focus and concentration, and to take extra time to
accomplish certain tasks. (Id. ¶ 77.)   Bielich treats this condition with medication. (Id. ¶
78.)   Although Bielich began seeing a licensed therapist in June 2008, she stopped seeing
that clinician around June 2009, and did not see another therapist during the time period at
issue in this case. (Id. ¶ 7.)   Bielich was diagnosed with depression after she was
terminated. (Id. ¶ 8.)

According to Bielich, she informed Ethicon about her condition, and the adverse effect it was having on her work performance, on six occasions: (1) a June 2, 2009 telephone call with Willick; (2) a June 24, 2009 telephone call with Tai; (3) an August 28, 2009 in-person meeting with Merklinger in Chicago, Illinois; (4) a September 10, 2009 in-person meeting with Willick in Dallas, Texas; (5) a December 15, 2009 in-person meeting with Tai; and (6) a January 6, 2010 email to Willick. (Id. ¶¶ 19, 94.) There is no genuine dispute that Bielich never made an explicit request for an accommodation from Ethicon; instead, Bielich contends that she implicitly requested an accommodation by disclosing her medical condition and explaining that it was negatively affecting her performance at work. (Id. ¶¶ 19, 22.)

On June 2, 2009, Bielich phoned Willick to tell him she was diagnosed with PMDD, was getting treatment for the disorder by starting medication, and now knew why she had been performing so badly in the past. (Id. ¶¶ 18, 19.) Bielich's deposition testimony indicates that she told Willick "that there was a reason that I hadn't been performing up to my potential, that there was a reason that I had made so many mistakes" and that PMDD "explains why I've been having so much trouble at work." (ECF No. 52-1 at 4.) Willick told Bielich that this information was "personal" and that if she wanted to discuss it further she should contact Tai, a human resources department employee. (Id. at 4-5.)

Bielich and Tai arranged a telephone call, to take place on June 24, 2009, because Tai would be involved in the sixty-day performance plan process. (ECF No. 63 ¶¶ 19, 22; ECF No. 52-1 at 8.) During that phone call, Bielich disclosed her PMDD diagnosis and told Tai that she wanted her "to understand why I've been struggling. There

9

is an explanation for what you guys call my poor performance." (ECF No. 52-1 at 9.) Tai responded that the matter was "personal" and indicated that Bielich could contact Ethicon's employee assistance program for counseling. (Id.) Bielich told Tai that she did not need to contact the program because she already had a good therapist. (ECF No. 63 ¶¶ 19, 101; ECF No. 52-1 at 9.)

Bielich meet with Merklinger in Chicago, Illinois, on August 28, 2009, when they were both there for a work-related conference. (ECF No. 63 ¶ 29.) Bielich and Merklinger were personal friends, as well as co-workers, and met privately after the day's business meetings to discuss various work and personal matters. (Id.; ECF No. 52-1 at 14:22-24.) According to Bielich she "broke down" at the meeting and told Merklinger "all of the difficulties I was having, how stressed I was. I told him about my medical condition, how I had been having suicidal thoughts. I was trying so hard to put on a good face" and about her emotional obstacles, fatigue, and the ups and downs with her medication. (ECF No. 52-1 at 14-15.) Bielich denies that she told Merlinger she was "okay." (ECF No. 63 ¶ 29.) Bielich later stated that during this meeting she knew she needed help, but did not know how to ask for it. (Id. ¶ 30.) She stated in her deposition that she "knew they were going to put me on the PIP. I didn't know what to do. I was afraid - you know, I felt fake it until you make it. Norma, collapsing in front of them is not going to do you any good, and I tried like crazy to pull myself together." (Id.)

Bielich met with Willick, in Dallas, Texas, on September 10, 2009, to discuss her performance under the sixty-day plan. (Id. ¶ 33.) Willick informed Bielich that she failed to satisfy the objectives of her sixty-day plan, shared with her negative comments made about her performance by internal customers, and told her that she would

be placed on a ninety-day PIP. (Id. ¶¶ 33, 36.)   According to Bielich she explained to Willick at this meeting that a change in birth control medication made her PMDD symptoms worse, and "that is exactly when my decline in performance happened" and that "I started my sixty-day development plan strong and I wavered" because her doctor was attempting to find the right doses of medication. (ECF No. 52-1 at 21:4-11, 22:1-4; ECF No. 63 ¶ 34.)   Bielich told Willick that she had been exhausted and stressed out due to her workload during this meeting. (ECF No. 63 ¶ 34.)

Bielich met in-person with Tai on December 15, 2009, to address Bielich's continued discussion of her relationship with Heniford at work. (Id. ¶ 59.) According to Bielich, during this meeting, she explained to Tai how her PMDD made her unfocused and unable to complete tasks in a timely manner (Id. ¶¶ 19, 59; ECF No. 52-1 at 3-4.)

Bielich and Willick exchanged a series of email communications on January 6, 2010, in which Bielich responded to Willick's "concerns about [her] performance." (ECF No. 63 ¶ 62; ECF No. 52-7 at 10.)   In a message sent by Bielich at 10:51 p.m., Bielich referenced her diagnosis with "a medical condition that I immediately sought help for" and stated that "I told you and Lena [Tai] that the onset of this condition perfectly corresponds to the decline in my performance." (ECF No. 63 ¶ 134; ECF No. 52-7 at 8.)

When an employee informs an Ethicon manager that he or she has a mental impairment that is affecting job performance, the employee is to be referred to Ethicon's occupational health department in order to determine whether job accommodations are needed. (ECF No. 63 ¶ 97.)   Bielich was never referred to the occupational health department. (Id. at 98.)

## II.     **Procedural History**

Bielich filed a charge of discrimination and harassment on the basis of gender and disability with both the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (ECF No. 14 ¶ 5.)   The EEOC issued a right to sue letter to Bielich on September 30, 2011. (Id.)   The instant complaint was filed on April 17, 2012. (Id.)

In her first amended complaint, Bielich makes a series of discrimination and retaliation claims based upon her gender and alleged disability. (ECF No. 14.)

- In Counts I and X, Bielich alleges that Ethicon violated Title VII and the PHRA by subjecting her to disparate treatment based on her gender. (ECF No. 14 ¶¶ 154, 286.)

- In Counts II, VI, and XI, Bielich alleges that Ethicon violated the ADA, the RA, and the PHRA by subjecting her to disparate treatment based on her alleged disability. (Id. ¶¶ 165-68, 219-22, and 299-302.)

- In Counts III, VII, and XII, Bielich alleges that Ethicon violated the ADA, the RA and the PHRA by failing to accommodate her alleged disability, PMDD. (Id. ¶¶ 177-81, 236-40, and 312-16.)

- In Counts IV, VIII, and XIII, Bielich alleges that Ethicon subjected her to a hostile work environment on the basis of her alleged disability, in violation of the ADA, the RA, and the PHRA. (Id. ¶¶ 189-99, 253-63, and 325-35.)

- In Counts V, IX, and XIV, Bielich alleges that Ethicon retaliated against her for engaging in protected activities, namely her implicit request for

accommodation, in violation of the ADA, the RA, and the PHRA. (Id. ¶¶ 206-08, 275-77, and 343-45.)

Ethicon asserts in its motion for summary judgment that it is entitled to judgment as a matter of law with respect to each of Bielich's legal claims because Bielich failed to meet her evidentiary burdens to support any of them. (ECF No. 46.) The court will address each grouping of legal claims below, but, in summary, finds that only the failure to accommodate claims made pursuant to the ADA and the PHRA are supported by sufficient evidence to warrant submission to a jury.

## III.   Applicable Law

### A.   Summary Judgment Standards

Federal Rule of Civil Procedure 56 provides in relevant part:

**(a) Motion for Summary Judgment or Partial Summary Judgment.**   A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.   The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   The court should state on the record the reasons for granting or denying the motion.

**…**

**(c)  Procedures.**

**(1)  *Supporting Factual Positions*.**   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produced admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d

Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the

record evidence, could rationally find in favor of the non-moving party in light of his

burden of proof." (citing Celotex Corp., 477 U.S. at 322-26; Liberty Lobby, 477 U.S. at

248-52)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. Of Phila. Bd. Of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

When the nonmoving party bears the burden of proof at trial, the moving party may discharge its burden by pointing out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once the moving party has made this showing, the burden then shifts to the nonmoving party, who cannot simply rest on the allegations in the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec., 475 U.S. at 586. Summary judgment is proper in cases where the nonmoving party's evidence in opposition is "merely colorable" or "not significantly probative." Liberty Lobby, 477 U.S. at 249-50.

**B. Title VII**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer (1) to… discharge any individual… because of such individual's… sex." 42 U.S.C. § 2000e–2(a)(1). Claims under the PHRA are interpreted coextensively with Title VII claims. Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). The court will refer only to Title VII in this opinion for ease of reference.

## C. **The ADA**

The ADA provides that "[n]o covered entity shall discriminate against a
qualified individual on the basis of disability in regard to… discharge of employees." 42
U.S.C. § 12112(a). The PHRA similarly prohibits discrimination on the basis of
disability. 43 P.S. § 955(a). The ADA's antiretaliation provision states that "[n]o person
shall discriminate against any individual because such individual has opposed any act or
practice made lawful by this chapter or because such individual made a charge, testified,
assisted, or participated in any manner in an investigation, proceeding or hearing under this
chapter." 42 U.S.C. § 12203(a). The same is true under the PHRA. 43 P.S. § 955(d).

The ADA Amendments Act of 2008 ("ADAAA"), Pub.L. 110–325, 122
Stat. 3553 (2008), became effective on January 1, 2009, and applies to this case because
Bielich was removed from her position on January 21, 2010. (ECF No. 51 at 3 n.1.) The
ADAAA broadens the ADA's scope by expanding the definition of disability, which had
been narrowed by Supreme Court interpretation, and by requiring a "less searching
analysis" of whether a plaintiff is "substantially limited." Pub.L. No. 110–325, §§
2(b)(1)-(6), 3(2)(a), § 4(a), 122 Stat. 3553, 3555; Kravits v. Shinseki, No. 10–861, 2012
WL 604169, at *6 (W.D. Pa. Feb. 24, 2012). The ADAAA changed the language of §
12112(a) from prohibiting discrimination against a qualified individual "because of"
disability, to "on the basis of" disability. It is not yet clear whether this change in
language will result in the less-exacting, motivating factor test being applied to ADA
disability discrimination claims. Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312
(6th Cir. 2012) (refusing to import the motivating factor test, applicable to Title VII
discrimination cases, 42 U.S.C. § 2000e-2(m), into the ADA, even after the ADAAA

changed the language of § 12112(a)); Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 961-62 (7th Cir. 2010) (similar); compare Siring v. Oregon St. Bd. Of Higher Educ., No. 11-1407, 2013 WL 5636718, *3 (D. Or. Oct. 15, 2013) (finding that the ADAAA confirms that the motivating factor test, and not the determinative factor test, applies to disability discrimination claims). The difference between the motivating factor and determinative factor tests is discussed in section IV.C.1(b), and footnote 2, infra.

The Pennsylvania legislature has failed to enact similar amendments to the PHRA. Szarawara v. Cnty. of Montgomery, No. 12–5714, 2013 WL 3230691, at *2 (E.D. Pa. June 27, 2013); Canfield v. Movie Tavern, Inc., No. 13–03484, 2013 WL 6506320, *5 (E.D. Pa. Dec. 12, 2013); Deserne v. Madlyn & Leonard Abramson Ctr. for Jewish Life, Inc., No. 10–03694, 2012 WL 1758187, *3 n.3 (E.D. Pa. May 17, 2012). As a result, some courts have refused to continue simultaneously analyzing ADA and PHRA claims. Id. Because, in this case, the court presumes for purposes of deciding the instant summary judgment motion, that Bielich can establish a prima facie case of disability discrimination and retaliation, and because she is unable to prove that Ethicon's reasons for terminating her were pretextual under either the motivating or determinative factor test, her ADA and PHRA claims can, and will, be considered together. Macfarlan v. Ivy Hill SNK, LLC, 675 F.3d 266, 274 (3d Cir. 2012); Eshelman v. Agere Sys., Inc., 554 F.3d 426, 433 n.3 (3d Cir. 2009); Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 318-19 (3d Cir. 2008); Williams v. Phila. House. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997); Lescoe v Pennsylvania Dept. of Corrections, 464 F.App'x 50, 52 n.6 (3d Cir. 2012); Flory v. Pinnacle Health

Hospitals, 346 F.App'x 872, 875 n.2 (3d Cir. 2009).   The court will refer only to the ADA in this opinion for ease of reference.

## IV. Discussion

### A.      RA Claims (Counts VI – IX)

"The Rehabilitation Act ... prohibits disability-based discrimination by government agencies and other recipients of federal funds...." Kralik v. Durbin, 130 F.3d 76, 78 n.2 (3d Cir. 1997) (citing Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1514–15 (2d Cir. 1995)).   Ethicon moved for entry of judgment as a matter of law on each of Bielich's RA claims on the grounds that there is no private right of action under § 503 of the RA, and Ethicon is not a recipient of federal financial assistance for purposes of § 504. (ECF No. 46 at 21; ECF No. 53 at 11.)   Bielich responds to Ethicon's arguments by stating summarily that Ethicon is subject to the RA because it is a federal government contractor that "has sold products to the federal government." (ECF No. 51 at 26; ECF No. 63 ¶ 79.)

Section 503 of the RA does not create a private cause of action. Bowers v. NCAA, 346 F.3d 402, 432 (3d Cir. 2003); see Beam v. Sun Shipbuilding & Dry Dock Co., 679 F.2d 1077, 1078 (3d Cir. 1982) (per curiam).   Although § 504 of the RA does create a private cause of action, the law is well-settled that in order to establish a violation of this section, a plaintiff must prove, among other things, that defendant engaged in a program or activity that receives federal financial assistance. Menkowitz v. Pottstown Mem'l Med. Ctr., 154 F.3d 113, 123 (3d Cir. 1998).

Bielich's evidence on this element of her claim is nothing more than a bald statement that defendant is a federal government contractor.   This is insufficient to subject a defendant to liability under § 504 of the RA. Culp v. Phila. Newspapers, Inc., No.

90-1927, 1991 WL 398715, at \*1 n.1 (E.D. Pa. Aug. 13, 1991), aff'd, 961 F.2d 1566 (3d Cir. 1992). Bielich submits no details regarding the alleged government contracts to which Ethicon is subject, the fair market value of the goods or services being exchanged, or the circumstances under which Ethicon receives federal financial assistance within the meaning of the RA.

Bielich failed to produce any evidence to support her allegation that Ethicon is subject to § 504 of the RA. Because Bielich failed to make a sufficient evidentiary showing on an essential element of her claim, no reasonable jury could find in her favor on any of her RA claims. Celotex, 477 U.S. at 325; Matsushita Elec., 475 U.S. at 586; Liberty Lobby, 477 U.S. at 249-50. For this reason, judgment as a matter of law will be entered in Ethicon's favor with respect to Counts VI, VII, VIII, and IX.

## B. Hostile Work Environment Claims (Counts IV, VIII, and XIII)

The Court of Appeals for the Third Circuit has assumed, without deciding, that a hostile environment claim exists under the ADA. Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 666-67 & n.2 (3d Cir.1999). The elements of such a claim are: (1) the plaintiff is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that the employer knew or should have known of the harassment and failed to take prompt effective remedial action. Id. at 667. The Supreme Court has stated:

> [W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating,

19

or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Ethicon seeks entry of judgment as a matter of law on Bielich's hostile work environment claims on the ground that she is unable to establish that she was subjected to severe or pervasive harassment because of her disability. (ECF No. 46 at 17.)   Bielich does not respond to Ethicon's motion in this regard in her opposition brief. (ECF No. 51.) Bielich's sur-reply brief likewise contains no facts, law, or argument with respect to these claims, even though Ethicon explicitly noted in its reply brief that Bielich's opposition brief was deficient in this respect. (ECF No. 51; ECF No. 53 at 11; ECF No. 68.)   Because Bielich makes no argument and submits no evidence in support of her hostile work environment claims, on which she will bear the burden of proof at trial, the claims cannot survive summary judgment. Celotex, 477 U.S. at 325; Matsushita Elec., 475 U.S. at 586; Liberty Lobby, 477 U.S. at 249-50.

The court, nevertheless, independently reviewed the record and found no evidence that could support a reasonable jury finding that Bielich was subjected to severe and pervasive harassment based on her disability that rose to the level of altering the conditions of her employment. The record is devoid of any evidence that Bielich was harassed at work for any reason.

For these reasons, judgment as a matter of law will be entered in Ethicon's favor with respect to Counts IV, VIII, and XIII.

### C.  Gender Discrimination Claims (Counts I and X)

#### 1)  Applicable Law

##### a)  The *Prima Facie* Case

To establish a prima facie case of sex discrimination under Title VII, a plaintiff must satisfy a four-part test.   The plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action;[1] and (4) the circumstances of the adverse action "give rise to an inference of unlawful discrimination." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 169 (3d Cir. 2013) (citing Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)).   The fourth prong can be established by showing that similarly situated individuals who were not members of the protected class were treated more favorably than the plaintiff. Nguyen v. AK Steel Corp., 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010) (citing Jones v. Sch. Dist. Of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999)).

##### b)  Pretext

Bielich's gender discrimination claims, as well as her disability discrimination claims, and disability retaliation claims, are analyzed pursuant to the familiar McDonnell Douglas burden-shifting framework. Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012)(citing cases); Williams, 380 F.3d at 759;  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002); Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998); Krouse, 126 F.3d at 500.   Under the McDonnell Douglas test, after a plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.

---

[1] The only adverse employment action about which Bielich complains is her termination, apart from her failure to accommodate claims, which will be discussed separately in section IV.F (ECF No. 51 at 3, 7.)

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). For the defendant to carry this burden, it must "clearly set forth" a legitimate, nondiscriminatory reason for the adverse employment action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981).

   If the defendant meets this burden, then the burden shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 253 (citing McDonnell Douglas, 411 U.S. at 804). To establish pretext a plaintiff must present specific evidence "from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative[2] cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). In order to avoid summary judgment, a plaintiff's evidence must allow a fact-finder to reasonably infer that the employer's proffered nondiscriminatory reason was either a post hoc fabrication or otherwise did not actually motivate the employment action. Id.

---

[2] Although the motivating and determinative factor tests are often used interchangeably and imprecisely, they are different. The motivating factor test is a less-exacting standard, which only applies in this case to Bielich's gender discrimination claims. Desert Palace, Inc. v. Costa, 539 U.S. 90, 94-95 (2003). The determinative factor, or "but for," test applies to Bielich's disability claims. Watson v. SEPTA, 207 F.3d 207, 214-15, 220 (3d Cir. 2000) (disability discrimination); Shaner v. Synthes, 204 F.3d 494, 500-501 & n.8 (3d Cir. 2000); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997) (ADA retaliation). Our court of appeals' approach to these kinds of claims is in line with recent Supreme Court precedent that applies the determinative factor, or "but for," test to Title VII retaliation claims, Univ. of Texas Southwestern Med. Ctr. v. Nassar, __ U.S. __, 133 S.Ct. 2517, 2533 (2013), and discrimination claims under the Age Discrimination in Employment Act ("ADEA"), Gross v. FBL Fin. Servs.. Inc., 557 U.S.167, 177-79 (2009), based at least partly on the fact that Title VII and the ADEA state that the employment action must be taken "because" of the individual's protected characteristic.

To meet that burden, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." Fuentes, 32 F.3d at 765. The fact that an employer made a poor or unwise decision does not make that decision discriminatory. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (stating that an employer may have any reason or no reason for its employment action, so long as it is not a discriminatory reason). Instead, evidence undermining an employer's proffered legitimate reasons must be sufficient to "support an inference that the employer did not act for its stated reasons." Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995).

Prong one of the Fuentes test focuses on whether a plaintiff submitted evidence from which a fact-finder could reasonably disbelieve the employer's articulated legitimate reasons for its employment decision. Under this prong, the plaintiff must point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' ...and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Fuentes, 32 F.3d at 765 (internal citations omitted). The question at prong one of the Fuentes test "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the employment decisions is discrimination. Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).

Prong two of the Fuentes test permits a plaintiff to survive summary judgment if she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762; see footnote 2, supra. The kinds of evidence relied upon

by the Court of Appeals for the Third Circuit under this prong of the Fuentes analysis are: 1) whether the employer previously discriminated against the plaintiff; 2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the employer previously treated more favorably similarly situated persons not within the protected class. Simpson, 142 F.3d at 644–45 (3d Cir. 1998).

The two prongs of the Fuentes test are distinct and, where appropriate, will be analyzed separately to determine whether sufficient evidence is presented to defeat a motion for summary judgment.

### 2) **The Parties' Arguments**

Ethicon contends that judgment must be entered in its favor on these claims because Bielich cannot satisfy the fourth element of the prima facie case, and, even assuming that she could, cannot establish that its legitimate nondiscriminatory reasons for terminating her were pretextual. (ECF No. 46 at 6-10.)   According to Ethicon, Bielich cannot establish that males were treated more favorably than she was, and cannot support her gender discrimination claims by simply "pointing to the fact that she is a woman." (Id. at 7-8, n.4.)   With respect to pretext, Ethicon contends that the record establishes that the reasons for Bielich's termination are true, by Bielich's own admissions. (Id. at 9-10.) Those reasons are her continuing performance deficiencies with respect to demonstrating a "sense of urgency," such as, missing deadlines, admitting to getting behind on her goals, and customer and co-worker complaints to that effect.

In response, Bielich argues that she satisfies the fourth prong of the prima facie case because she was replaced by a male, which gives rise to an inference of sex discrimination. (ECF No. 51 at 3.)   Bielich claims that, having made out a prima facie case, she satisfies her burden to overcome summary judgment by pointing to evidence: (1) that would support a reasonable inference that males were generally treated more favorably at Ethicon than females; and (2) that the sixty- and ninety-day performance plans were not "legitimate management tools to measure or improve Bielich's performance, but rather were result-oriented pretexts to cover up discrimination." (Id. at 17, 21, 23.)

In support of the first contention, Bielich notes that a) security guards were present when she was terminated, but not when a male was terminated, b) women were punished for discussing personal matters at work, but males were not, and c) males were permitted to take medical leave, but females were not. (Id. at 19-20.)   In support of the second contention, Bielich relies on a) purported procedural flaws in the performance review process, b) her opinion that she "did well" on the plans, c) difficulties and increased burdens imposed upon her by management during the plans, and d) various other facts of record challenging the soundness of Ethicon's decision-making process. (Id. at 21-22.) Bielich addresses each of the missed deadlines that were included in her termination memorandum, explaining why the deadline was a) not actually missed, b) flexible, or c) not "part of the sixty- or ninety-day plans," thus allegedly permitting a reasonable jury to conclude that the plans were a subterfuge for discrimination. (Id. at 23-26.)   In her final brief, Bielich contends that a jury could find Ethicon's proffered reasons for her termination to be pretextual because the rationale for her termination was "in continual flux." (ECF No. 68 at 7.)

Ethicon contends that the fact that a male was hired to replace Bielich is without consequence because this is not a failure-to-hire or reduction-in-force case. (ECF No. 53 at 2.) Ethicon argues that Bielich cannot establish pretext by second-guessing her managers' conclusion that her performance had not sufficiently improved, especially given that she admitted at her deposition to each of the performance deficiencies listed in her termination letter. (Id. at 3-4 & n.4; ECF No. 70 at 3, 4-5.)

With respect to the purported unfairness of the review process and the now-alleged flexibility of its deadlines, Ethicon notes that Bielich participated in setting the deadlines, even being permitted to adjust them in order to provide more time to meet them. (ECF No. 68 at 5-6.) Finally, Ethicon explains that different circumstances justify each of the purported differences in treatment of the men and women identified by Bielich. (Id. at 4-5.) According to Ethicon, Bielich's situation with respect to discussing personal matters at work is distinguishable because she was given a specific instruction, after a co-worker complained about her inappropriate conversation at work, to stop discussing her relationship with Heniford; yet Bielich disregarded management's instructions by continuing to do so. (ECF No. 53 at 5-6.) With respect to the males identified by Bielich who were permitted to take medical leave, by Bielich's own admission, both suffered from physical injuries resulting from a discrete event, i.e., a heart attack and a car accident, making their circumstances distinguishable from Bielich's ongoing health condition. (ECF No. 52 ¶ 157.)

### 3) **Discussion and Conclusion**

#### a) **The *Prima Facie* Case**

Ethicon challenges Bielich's ability to satisfy the fourth prong of her prima facie case. Bielich's only argument in direct response is that a male being hired to fill her position after she was fired gives rise to an inference of unlawful discrimination. The gender of Bielich's replacement may raise an inference of discrimination, but is not necessarily determinative. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 355-56 (3d Cir. 1999); Williamson v. Penn Millers Ins. Co., No. 04-1142, 2005 WL 3440633, at *5-6 (M.D. Pa. Dec. 14, 2005). For purposes of summary judgment only, the court will assume that Bielich can establish a prima facie case of gender discrimination, and will consider whether Bielich can prove that Ethicon's proffered reasons for her termination were pretexts for gender discrimination.

#### b) **Pretext**

Assuming for purposes of deciding the instant motion for summary judgment that Bielich can establish a prima facie case of gender discrimination, Ethicon articulated legitimate, nondiscriminatory, reasons for terminating her, i.e., continuing performance deficiencies with respect to demonstrating a "sense of urgency," such as missing deadlines, admitting to getting behind, and customer and co-worker complaints to that effect. It is Bielich's burden to prove by a preponderance of the evidence that these were not Ethicon's true reasons for firing her, but were instead pretexts for discrimination. Jones, 198 F.3d at 410. To do so, Bielich must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either: (1) disbelieve Ethicon's articulated legitimate reasons; or (2) believe

that an invidious discriminatory reason was more likely than not a motivating cause of Ethicon's action. Fuentes, 32 F.3d at 764.

The court applies the two-part test of Fuentes to determine whether Bielich can prove pretext: prong one focuses on whether there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" that a reasonable jury could find them "unworthy of credence;" and prong two permits Bielich to survive summary judgment if she can demonstrate that "discrimination was more likely than not a motivating… cause of the adverse employment action" by showing that the employer previously discriminated against her or treated employees differently based on their gender. Fuentes, 32 F.3d at 762; Simpson, 142 F.3d at 644–45.

### i) **Prong One**

Bielich identifies a myriad of evidence that purportedly demonstrates that Ethicon's reasons for terminating her are not to be believed.   Among this collection is that a) her draft termination letter references her disclosure of personal issues as a reason for her termination, b) the 2008 performance review conducted by Hart on April 24, 2009, was not in writing, c) the deadlines she allegedly missed were flexible and arbitrary, d) she received positive as well as negative feedback during her plans, e) her workload was increased during the plans, and f) a draft termination letter was prepared before expiration of her ninety-day PIP. (ECF No. 51 at 17-26.)   In short, Bielich contends that a reasonable jury could conclude that Ethicon viewed her as a "woman scorned due to disability" and used the sixty- and ninety-day plans as a subterfuge for discrimination.

One common flaw with each of Bielich's innumerable, individual challenges to Ethicon's reasons for firing her is that Bielich does not, and cannot, dispute that a) a lack of a "sense of urgency" was identified by management as an area in need of improvement from the inception of the performance review process, b) she, as matter of verifiable proof, repeatedly missed deadlines established by management, c) she admitted to management that she missed deadlines and got behind on her goals, and d) management received complaints about her failure to complete tasks and respond to inquiries in a timely manner from customers and co-workers. (ECF No. 63 ¶¶ 14, 33, 36, 38, 48-58, 125, 147-51; ECF No. 48-2 at 33-39; ECF No. 52-7 at 8.) Regardless what other facts may have existed, such as positive feedback, increased workloads, or defects in the review process, management was free to give more weight to Bielich's continued sub-par performance in an area identified at the outset of the performance review process as a concern, and terminate her on that basis. The question at prong one of the Fuentes test "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the employment decisions is discrimination or retaliation. Keller, 130 F.3d at 1109. There is no evidence in the record from which a reasonable jury could conclude that the real reason Bielich was fired was not poor performance, but was instead her gender.

Bielich's argument with respect to pretext suffers from another fundamental flaw. It is inherently inconsistent with her failure to accommodate claims. Bielich cannot contend for purposes of her gender discrimination claims that Ethicon fabricated her poor performance, but then for purposes of her failure to accommodate claims contend that she performed poorly only because Ethicon refused to accommodate her disability. Although this inconsistency might be tolerable at the pleading and discovery stage, it is no longer tolerable at

the summary judgment stage.   Because Bielich cannot establish pretext under either prong one

or prong two of the Fuentes test, her gender discrimination claims cannot move forward.

In addition, upon closer examination, none of Bielich's arguments demonstrate

such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that would

permit a reasonable jury to disbelieve that Ethicon fired Bielich due to poor performance, and

instead believe that she was fired due to her gender.   By way of example, Bielich's draft

termination letter is not probative of discrimination.   With respect to its timing, the ninety-day

plan explicitly states that employment could be terminated prior to expiration of the plan. (ECF

No. 63 ¶ 145.)   Willick's inclusion of Bielich's discussion of personal matters at work in his

draft termination letter is ultimately without consequence. (Id.)     Bielich herself characterizes

Willick as "very angry" after he received another complaint that she was discussing her

relationship with Heniford and her medical conditions at work after he specifically asked her

not to do so. (Id. ¶¶ 122-23.)   Under the circumstances, it is unsurprising that the termination

letter that Willick drafted, before consultation with other managers and human resources

officials, references that incident.   There is no dispute that Bielich continued to perform

poorly by missing deadlines, and otherwise demonstrating a lack of a "sense of urgency" to

management, customers, and co-workers, which were the reasons consistently given to Bielich

for her termination. (Id. ¶¶ 63-64, 143.)

Bielich's numerous challenges to the procedural and substantive soundness of

the sixty- and ninety-day performance plans similarly would not permit a reasonable jury to

disbelieve Ethicon's reasons for terminating her.   There is no evidence that the 2008 annual

review conducted by Hart on April 24, 2009, was ineffectual because it was not in writing,

beyond Bielich's opinion and speculation.   Bielich's numerous complaints about the

performance plans, such as that her duties were increased, or made more difficult, only negative feedback was shared with her, and she did well in some areas, are without ultimate consequence. There is no evidence that decisions on any of these issues were made because Bielich is a woman. Both she and Summerlin, a male, experienced the same increase in workload when their department went from having three employees to two employees upon the promotion of Hart and until the hiring of Mauri. Bielich's alleged positive feedback and performance in other areas are irrelevant in light of the record, which demonstrates that management expressed concerns with respect to her lack of a consistent "sense of urgency" from the beginning, and continually informed her that her performance in that area was not satisfactorily improving.

There is no dispute that Bielich missed deadlines, admitted to doing so and to getting behind on her goals, and that customers and co-workers complained about her timeliness in completing tasks and responding to inquiries. (ECF No. 63 ¶¶ 14, 33, 36, 38, 48-58, 125, 147-51.) Bielich's many explanations with respect to why those complaints were mistaken or unfounded do not negate an employer's ability to terminate an employee who consistently misses deadlines and is the target of repeated complaints for doing so after being informed by management that there is a performance deficiency in that area. On the issue of deadlines, Beilich's position that the deadlines in her PIP were flexible, and that she had no duty to meet any other deadline set for her by management if it was not listed in her performance plans is entirely without merit. Were this the case, Bielich would have had no reason to have extended certain deadlines at the beginning of her PIP to allow more time to meet them. (Id. ¶ 41.) A reasonable jury could not disbelieve Ethicon's proffered legitimate

nondiscriminatory reasons based on Bielich's perceived inequities and alleged flaws in the performance review process.

In summary, none of Bielich's laundry list of challenges to Ethicon's reasons for terminating her rise above second-guessing Ethicon's business decisions. None of them, alone, or in combination, provide sufficient evidence to support a reasonable jury finding that Ethicon's legitimate, nondiscriminatory reasons are so implausible that they are unworthy of belief, and that gender discrimination was the real reason for Bielich's termination. Bielich admits, as she must in order to advance plausible failure to accommodate claims, that she was not performing up to Ethicon's expectations. (Id. ¶¶ 14, 33, 36, 38, 48-58, 125, 147-51.) She identifies no evidence of record sufficient to support a reasonable jury finding to the contrary. For this reason, she cannot establish that Ethicon's reasons for terminating her are unworthy of belief under the first prong of the Fuentes test.

### ii) **Prong Two**

Even though Bielich failed to produce evidence that would support a reasonable jury finding in her favor under the first prong of the Fuentes test, she can survive summary judgment if, under the second prong of the Fuentes test, she demonstrates that "discrimination was more likely than not a motivating… cause of the adverse employment action." Fuentes, 32 F.3d at 762. Bielich may do so by showing that: 1) Ethicon previously discriminated against her; 2) Ethicon discriminated against other persons within her protected class; or 3) Ethicon previously treated more favorably similarly situated persons not within Bielich's protected classes. Simpson, 142 F.3d at 644–45 (3d Cir.1998).

Bielich does not specifically address this second prong of the Fuentes test, and accordingly, fails to identify any evidence pertinent to these three considerations. The court nevertheless extrapolated evidence of record from Bielich's other arguments that might be relevant to each factor to determine whether her gender discrimination claims could possibly survive summary judgment under prong two of the Fuentes test. The court concludes that they cannot.

        a) Previous Discrimination Against Bielich

        There is no evidence that Ethicon previously discriminated against Bielich.

        b) Discrimination Against Other Women

        Bielich does submit various pieces of evidence that Ethicon discriminated against another woman, Kelly Luedtke ("Luedtke"). Specifically, Bielich claims that a) Luedtke was punished for referring to Heniford as an "ass," while a man, Hart, was not punished for making the same kind of comments, (ECF 63 ¶ 84), b) Hart refused to promote Luedtke because she had four children, (Id. ¶ 91), and c) Hart showed Luedtke sexually explicit photographs at work, without punishment, (Id.).

        The record reflects that Heniford himself became aware of Luedtke's alleged comment, and he discussed the matter with one of her managers. (Id. ¶¶ 84, 130.) There is no evidence in the record that Heniford, or any other customer, was made aware of Hart's negative comments about him. This difference explains why Luedtke may have been punished, and Hart was not. For the same reasons, Hart's comments about Luedtke's children and display of sexual images at work are not probative of discrimination against Bielich. There is no evidence in the record that management was made aware of these

issues, and there is no evidence that Bielich was terminated for similar conduct, while males were not.

Bielich failed to produce any evidence that Ethicon discriminated against other women.

### c) More Favorable Treatment of Male Employees

Although not framed within the context of the second prong of the Fuentes test, Bielich does contend that males were treated more favorably at Ethicon because Willick and Hart were permitted to discuss personal matters at work without punishment, but she was not. (ECF 63 ¶¶ 84, 130.) As an initial matter, these situations are unrelated to Bielich's termination, and could not support a reasonable inference of gender discrimination in connection with that adverse employment action. Secondly, the record reflects that the consistent determinative factor with respect to punishment was whether or not management received complaints about the conduct, not whether the actor was male or female. (ECF No. 63 ¶¶ 17, 84, 130.) The record reflects that customers and co-workers complained to management about Bielich and Luedtke; they did not complain about Willick or Hart. Finally, there is no evidence that either Willick or Hart disregarded management's instruction not to discuss certain issues at the workplace.

Bielich failed to produce any evidence that Ethicon more favorably treated men.

Because Ethicon offered legitimate nondiscriminatory reasons for her termination, and because Bielich cannot satisfy either prong of the Fuentes test in order to establish that Ethicon's reasons are pretextual, she can create no triable issue with respect to her gender discrimination claims. There is no evidence from which a reasonable jury

could find that Bielich's gender was a motivating factor in her termination.   Judgment

must be entered in favor of Ethicon on Counts I and X.

### D.  Disability Discrimination Claims (Counts II, VI, and XI)

#### 1)  Applicable Law

##### a)   The *Prima Facie* Case

To establish a <u>prima</u> <u>facie</u> case of discrimination under the ADA, a plaintiff

must show that: (1) she is a disabled person within the meaning of the ADA; (2) she is

otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodations; and (3) she has suffered an adverse employment decision on the basis of

that disability. <u>Macfarlan</u>, 675 F.3d at 274; <u>Williams</u>, 380 F.3d at 761 (quoting <u>Taylor v.

Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999)).   To satisfy the requirement of

having a "disability," a plaintiff may demonstrate: (1) an actual mental or physical

impairment that substantially limits one or more major life activities; (2) a record of such

impairment; or (3) that his employer regarded him as having a disability. <u>Marinelli v. City

of Erie, Pa.</u>, 216 F.3d 354, 359 (3d Cir. 2000).   The Court of Appeals for the Third Circuit

recognizes that concentrating, remembering, cognitive function and thinking are major life

activities. <u>Emory v. Astrazeneca Pharms., L.P.</u>, 401 F.3d 174, 183 (3d Cir. 2005);

<u>Gagliardo v. Connaught Labs., Inc.</u>, 311 F.3d 565, 569 (3d Cir. 2002); <u>Taylor</u>, 184 F.3d

296 at 307.

#### b) Pretext

The same <u>McDonnell Douglas</u> burden-shifting analysis applies to Bielich's

disability discrimination claims as set forth above in section IV.C.1(b). <u>Shaner v. Synthes</u>,

203 F.3d 494, 500 (3d Cir. 2000).   In the context of the ADA, to establish pretext a

plaintiff must present specific evidence from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. See footnote 2, supra; Fuentes, 32 F.3d at 764; Watson, 207 F.3d at 212-13.

### 2) **The Parties' Arguments**

Ethicon contends that judgment must be entered in its favor on Bielich's disability discrimination claims because Bielich can produce no evidence that any non-disabled employee was treated more favorably than her. (ECF No. 46 at 7-8.) According to Ethicon, even if Bielich could establish a prima facie case of disability discrimination, as with her gender discrimination claims, she cannot establish that its legitimate, nondiscriminatory reasons for terminating her were pretextual. (Id. at 6-10.)

In response, Bielich argues that she need not prove that similarly-situated non-disabled employees were treated more favorably than she was in order to make out a disability discrimination claim. (ECF No. 51 at 4)  Bielich further contends that Ethicon does not dispute that she is disabled and a qualified individual within the meaning of the ADA, and that according to recent decisions from the United States District Court for the Eastern District of Pennsylvania, the fact that she was terminated satisfies the final element of her prima facie case. (Id. at 5-7.)

Having satisfied the elements of the prima facie case, Bielich asserts that the record is replete with evidence that the reasons given for her termination were pretexts for disability discrimination. (Id. at 17-26.)  In large part, Bielich relies on the same evidence regarding the failings and illegitimacy of the sixty- and ninety-day plans in support of her pretext argument under the ADA, as she did in support of her pretext argument under Title

VII. (ECF No. 51 at 20-26; <u>see</u>, section IV.C.2, above.)   She, however, adds references to a) management's after-the-fact denial that she disclosed her PMDD to them, b) characterization of her disease as a "personal matter" separate from her performance problems, and c) referral of her to the employee assistance program for counseling. (<u>Id.</u> at 17-19.)

        In its reply brief, Ethicon disputes that Bielich is a qualified individual who could perform the essential functions of her position with or without reasonable accommodation. (ECF No. 53 at 2-4.)   Assuming, arguendo, that Bielich could make out a <u>prima facie</u> case, Ethicon makes the same counter-arguments with respect to pretext as it did in the context of Bielich's gender discrimination claims.

### 3)  **Discussion and Conclusion**

#### a)  **The *Prima Facie* Case**

        The court assumes for purposes of summary judgment that Bielich can satisfy the elements of her <u>prima facie</u> disability discrimination case.   The question, therefore, becomes whether Bielich can prove that Ethicon's proffered reasons for her termination were pretexts for disability discrimination.   Because there is no basis on which to so find, judgment as a matter of law will be entered in Ethicon's favor on Counts II, VI, XI.

#### b)  **Pretext**

        Assuming for purposes of deciding the instant motion for summary judgment that Bielich can establish a <u>prima facie</u> case of disability discrimination, Ethicon articulated legitimate, nondiscriminatory, reasons for terminating her, i.e., continuing performance deficiencies with respect to demonstrating a "sense of urgency," such as, missing deadlines,

admitting to getting behind, and customer and co-worker complaints with respect to timeliness.

It is Bielich's burden to prove by a preponderance of the evidence that these were not Ethicon's

true reasons for firing her, but were instead pretexts for disability discrimination.   Jones, 198

F.3d at 410.   To do so, Bielich must point to some evidence, direct or circumstantial, from

which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was more likely than not the

determinative cause of the employer's action. Fuentes, 32 F.3d at 764.

### i) Prong One

Under the first prong of the Fuentes test, Bielich must identify "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Ethicon's

proffered legitimate reasons for terminating her that a reasonable jury could find them

"unworthy of credence."   Bielich relies largely on the same evidence already analyzed by the

court in the context of her gender discrimination claims.   Bielich does, however, add

references to a) management's after-the-fact denial that she disclosed her PMDD to them, b)

management's characterization of her disease as a "personal matter" separate from her

performance problems, and c) referral of her to the employee assistance program for

counseling. (ECF No. 51 at 17-26.)   Bielich's ultimate argument, however, remains the same:

that a reasonable jury could conclude that Ethicon viewed her as a "woman scorned due to

disability" and used the sixty- and ninety-day plans as a subterfuge for discrimination.

The court's analysis of Bielich's innumerable, individual challenges to

Ethicon's reasons for firing her in the context of her gender discrimination claims applies with

equal force here.   Here too, the court concludes that none of Bielich's arguments demonstrate

such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that would

permit a reasonable jury to disbelieve that Ethicon fired Bielich due to poor performance, and instead believe that she was fired because of her disability.

Likewise, as with Bielich's pretext argument in the context of her gender discrimination claims, her pretext argument with respect to her disability discrimination claims is inherently inconsistent with her failure to accommodate claims.   Again, it is Bielich's disability discrimination claims that cannot move forward because they are not supported by sufficient evidence to overcome summary judgment.   The court's examination of each of Bielich's challenges to the performance review process remains the same.   None of Bielich's new arguments raised in the context of her disability discrimination claims indicate that Ethicon's reasons for terminating her cannot be believed.   As an initial matter, management concedes for purposes of summary judgment that Bielich disclosed her medical condition to them.   Bielich's contention that management labeled her PMDD a "personal matter" and referred her to the employee assistance program for counseling does not change the analysis or the result.   These isolated and separable acts, alone or in combination with any other arguments made by Bielich, would not permit a reasonable jury to find Ethicon's proffered reasons for her termination to be unworthy of belief.   There is no dispute that Bielich missed deadlines, got behind on her work, and that customers and co-workers complained about her timeliness in completing tasks and responding to inquiries to management. (ECF No.63 ¶¶ 14, 33, 36, 38, 48-58, 125, 147-51.)

For this reason, Bielich cannot establish that Ethicon's reasons for terminating her are unworthy of belief under the first prong of the Fuentes test.

### ii) **Prong Two**

Even though Bielich failed to produce evidence that would support a
reasonable jury finding in her favor under the first prong of the Fuentes test, she can
survive summary judgment if, under the second prong of the Fuentes test, she demonstrates
that discrimination was more likely than not a determinative cause of her termination.
Fuentes, 32 F.3d at 762. Bielich may do so by showing that: 1) Ethicon previously
discriminated against her; 2) Ethicon discriminated against other disabled employees; or 3)
Ethicon previously treated more favorably similarly situated non-disabled employees.
Simpson, 142 F.3d at 644–45. Bielich does not specifically address this second prong of
the Fuentes test, and accordingly, fails to identify any evidence pertinent to these three
considerations. The court nevertheless extrapolated evidence of record from Bielich's
other arguments that might be relevant to each factor to determine whether her disability
discrimination claims could possibly survive summary judgment under prong two of the
Fuentes test. The court concludes that they cannot.

#### a) Previous Discrimination Against Bielich

There is no evidence that Ethicon previously discriminated against Bielich.

#### b) Discrimination Against Disabled Employees

Bielich contends that Ethicon discriminated against other disabled
employees. In support of this contention, Bielich submits evidence to purportedly
establish that former employees McGinnis, Sawicki, and Smith were all disabled, and were
all terminated after being placed on PIPs. (ECF 63 ¶ 114.) Their treatment, however, is
not indicative of discrimination against Bielich because their circumstances are different.
Neither Sawicki nor Smith were terminated; the former resigned and the latter went on

long-term disability. (ECF No. 52-10 at 22-23; ECF No. 52-3 at 12.) McGinnis' disability, shingles, developed only after he was placed on a PIP, and required that he take short-term disability until the condition cleared. (ECF No. 52-10 at 21.)

Based on these differences, and the lack of any other evidence in the record making these former-employees' experiences probative of discrimination against Bielich, a reasonable jury could not conclude that disability discrimination was the real reason for Bielich's termination.

c) More Favorable Treatment of Non-Disabled Employees

Bielich submits no evidence that can be viewed as relevant to this consideration.

Bielich failed to present any probative evidence under the second prong of the Fuestes test to indicate that disability discrimination was the real reason for her termination.

Because Bielich cannot satisfy either prong of the Fuentes test, she can create no triable issue with respect to her disability discrimination claims. There is no evidence from which a reasonable jury could find that Bielich's disability was the determinative factor in her termination. The court would reach the same ultimate conclusion even if the less-exacting motivating factor test were applied. There is no evidence in the record from which a reasonable jury could conclude that Bielich's disability motivated Ethicon's decision to terminate her employment to any extent. Judgment must be entered in favor of Ethicon on Counts II, VI, XI.

### E. Disability Retaliation Claims (Counts V and XIV)

#### 1) Applicable Law

##### a) The *Prima Facie* Case

Discrimination against an individual who has opposed a practice prohibited by the ADA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute is itself actionable conduct. 42 U.S.C. § 12203(a). The same is true under the PHRA. 43 P.S. § 955(d).

The prima facie case elements for a retaliation claim under the ADA are as follows: 1) the plaintiff engaged in activity protected by the antidiscrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore v. City of Phila., 461 F.3d 331, 340–42 (3d Cir. 2006). The plaintiff does not have to show that she is a qualified individual with a disability to bring a retaliation claim. Hohider v. United Parcel Serv., 574 F.3d 169, 191 n.19 (3d Cir. 2009).

##### b) Pretext

The same McDonnell Douglas burden-shifting analysis applies to Bielich's disability discrimination claims as set forth above in section IV.C.1(b). Shaner, 203 F.3d at 500; Krouse, 126 F.3d at 500-01. In the context of the ADA, to establish pretext a plaintiff must present specific evidence from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's

action. See footnote 2, supra; Fuentes, 32 F.3d at 764; Krouse, 126 F.3d at 500-01; Shaner, 204 F.3d at 501.

### 2) The Parties' Arguments

Ethicon contends that Bielich's disability retaliation claims are deficient because she never requested an accommodation, making it impossible to satisfy the first prong of the prima facie case. (ECF No. 46 at 19-20.)   Even assuming that Bielich could make out a prima facie case of disability retaliation, Ethicon argues that she can come forth with no evidence from which a reasonable jury could conclude that its proffered reasons for terminating her were pretexts for retaliation. (ECF No. 46 at 20; ECF No. 53 at 10.)

In response, relying entirely on argument previously made, Bielich asserts that her retaliation claims are triable because a reasonable jury could find that she implicitly requested an accommodation. (ECF No. 51 at 25.)   Bielich does not address Ethicon's assertion that she is unable to produce evidence from which a reasonable jury could find its reason for terminating her to be pretextual in the context of her alleged retaliation claims. (Id.)

The court assumes for purposes of summary judgment that Bielich can satisfy the elements of her prima facie case.   As with her discrimination claims, Bielich, however, cannot establish that the reasons for her termination were pretexts for disability retaliation, and for that reason judgment as a matter of law will be entered in Ethicon's favor on Counts V, IX, and XIV.

43

### 3) Discussion and Conclusion

#### a) The *Prima Facie* Case

As an initial matter, the court questions whether, under the facts of this case, Bielich can establish the first prong of her prima facie case, i.e., that she engaged in protected activity. Here, as will be discussed below, Bielich's failure to accommodate claims survive only because there is evidence from which a reasonable jury could find that Ethicon failed to engage in the interactive process in response to her disclosure that a medical condition was adversely affecting her work performance. It is undisputed that Beilich never explicitly requested an accommodation. There is no evidence that Bielich filed any complaints or charges of discrimination within Ethicon, or any other entity. Although she asks in her January 6, 2010 email whether a "PIP was the compassionate or helpful way to go" after she revealed her PMDD diagnosis to Willick and Tai, it is undisputed that the decision to terminate Bielich predated that email, and, regardless, it is questionable whether that statement would rise to the level of protected activity itself. (ECF No. 52-7 at 1-4, 8.)

The court, however, will assume for purposes of deciding the instant motion for summary judgment that Bielich can establish a prima facie case of disability retaliation. The question, therefore, becomes whether Bielich can prove that Ethicon's proffered reasons for her termination were pretexts for disability retaliation. Because there is no basis on which to so find, judgment as a matter of law will be entered in Ethicon's favor on Counts V and XIV.

44

### b) **Pretext**

Ethicon articulated legitimate, nondiscriminatory, reasons for terminating her, i.e., failing to demonstrate a consistent "sense of urgency," including missing deadlines, getting behind on her goals, and being subject to complaints from customers and co-workers with respect to a lack of timeliness. It is again Bielich's burden to prove by a preponderance of the evidence that these were not Ethicon's true reasons for firing her, but were instead pretexts for retaliation. Jones, 198 F.3d at 410. To do so, Bielich must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. Fuentes, 32 F.3d at 764.

The analysis under prongs one and two of the Fuentes test in the context of these claims is identical to that in the context of Bielich's disability discrimination claims. See, section IV.D.3.

Because Bielich cannot satisfy either prong of the Fuentes test, she can create no triable issue with respect to her disability retaliation claims. There is no evidence from which a reasonable jury could find that Bielich's protected activity was a determinative factor in her termination. The court would reach the same ultimate conclusion even if the less-exacting, motivating factor test were applied. There is no evidence in the record from which a reasonable jury could conclude that Bielich's protected activity motivated Ethicon's decision to terminate her employment in any way. Judgment must be entered in favor of Ethicon on Counts V and XIV.

### F.    Failure to Accommodate Claims (Counts III and XII)

#### 1)    The Applicable Law

The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does not "'mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004) (internal citations omitted); 42 U.S.C. § 12112(b)(5)(A) (2000).    A reasonable accommodation is one involving "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position ...." 29 C.F.R. § 1630.2(o)(1)(ii).    "Reasonable accommodation" further "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith" ..., under what has been termed a duty to engage in the "interactive process." Williams, 380 F.3d at 761.

Failure to accommodate claims are distinct from claims of disparate treatment, and are not governed by the shifting-burden scheme set out in McDonnell Douglas. See Walton v. Mental Health Assn. of Southeastern Pa., No. 96-5682, 1997 WL 717053, at *10 (E.D. Pa. Nov. 17, 1997); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 263–64 (1st Cir. 1999).    Failure to accommodate claims "do[ ] not require that an employer's action be motivated by a discriminatory animus directed at the disability." Higgins, 194 F.3d at 264.

In order to survive summary judgment on a failure to accommodate claim under the ADA and the PHRA, a plaintiff must point to evidence in the record sufficient to establish that: (1) she was disabled and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated. Armstrong v. Burdette Tomlin Mem. Hosp., 438 F.3d 240, 246 (3d Cir. 2006); Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 330-31 (3d Cir. 2003). Because the analysis of the ADA claim and the PHRA claim is identical, the court's discussion will only reference the ADA going forward, with the understanding that the analysis applies with equal force to the PHRA claim. Taylor, 184 F.3d at 306.

Controlling case law requires an employee to provide the employer with both notice of the disability and a request for an accommodation, whereby the employee makes clear that she wants assistance for his or her disability. Colwell v. Rite Aid Corp., 602 F.3d 495, 506 (3d Cir. 2010). Although an employee's request "does not have to be in writing, be made by the employee, or formally invoke the words 'reasonable accommodation,' ... the employer must know of both the disability and the employee's desire for accommodation," or circumstances must be sufficient to cause a reasonable employer to make inquiries about the possible need for an accommodation. Taylor, 184 F.3d at 313; Conneen, 334 F.3d at 332. A statement by an employee that she is disabled or has been diagnosed with a disease or disorder, without more, is insufficient to constitute a request for an accommodation. Taylor, 184 F.3d at 313; Prigge v. Sears Holding Corp., No. 09-175, 2010 WL 2731589, at *8 (E.D. Pa. July 9, 2010). Once an accommodation is requested, the employer is required to engage in the interactive process during which the

47

employer and employee identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome them. Taylor, 184 F.3d at 311.

Even if the employee requests an accommodation and the employer refuses to engage in the interactive process, a prima facie case is not made out unless the employee also submits evidence establishing that she could have been reasonably accommodated. "The ADA… is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997). It is the employee's burden to show that accommodations existed that would have rendered her capable of performing the essential functions of the job. Stanley v. Lester M. Prange, Inc., 25 F.Supp.2d 581, 584 (E.D. Pa. 1998). Summary judgment can be granted in favor of the employer where the employee's proposed accommodations would be clearly ineffective. Walton, 168 F.3d at 670.

### 2) **The Parties' Arguments**

Ethicon moves for summary judgment on Bielich's failure to accommodate claims on the grounds that she cannot establish that she requested an accommodation or that a reasonable accommodation existed. (ECF No. 46 at 11.) With respect to Bielich's failure to request an accommodation, Ethicon cites to Bielich's numerous admissions in the record that she never explicitly requested an accommodation, and her purported repeated assurances to management that she was "ok" and was able to perform her job duties. (Id. at 12-14.) According to Ethicon, the court cannot find that Bielich requested an accommodation because she affirmatively hid her disability from management so that she would not be perceived as "weak" or "inadequate." (Id. at 13-14.)

48

With respect to the lack of any reasonable accommodations, Ethicon notes that Bielich identified three possible accommodations: (1) "realignment of some of the workload"; (2) some leeway for time off to visit doctors; and (3) "occasional days off." (Id. at 15.) According to Ethicon, there is no evidence in the record to establish that Bielich's performance would have improved if she had been given these accommodations. (Id.) Ethicon also argues that the ADA does not require an employer to make co-workers' jobs harder, and that, in any event, Bielich acknowledged to her supervisors at the time that her workload was less than her fellow team members by assuming responsibility for "booking local SSI events" in order to "pull my weight and take some stuff off" her co-worker's plates. (Id. at 15; ECF No. 63 ¶ 71.) With respect to time off to attend appointments or to rest, Ethicon notes that Bielich's work-from-home job, for which she set her own work hours, already gave her these benefits. (ECF No. 46 at 15-16.)

In response, Bielich contends that the record reflects that Ethicon knew about her disability and that she requested an accommodation. (ECF No. 51 at 7-10.) According to Bielich, the record reflects that she told each of her managers and the human resources department representative about her condition, and also presented with symptoms of a mental impairment when she cried in front of her managers and revealed suicidal thoughts. (Id. at 8.) Bielich does not contend that she explicitly requested an accommodation, but argues that Ethicon knew, or should have known, about her need for an accommodation when she told Ethicon, on six occasions between June 2, 2009, and January 6, 2010, that her disability was negatively affecting her work. (Id. at 9-12.) Bielich contends that a reasonable jury could find in her favor on her failure to accommodate claims because Ethicon managers a) admitted that they were not trained on

how to accommodate a disabled employee, b) failed to follow the procedures set forth in Ethicon's "Accommodations Toolkit", and c) increased her workload and "watched her like hawks" after she disclosed her disability. (Id. at 12-14.)

On the issue of reasonable accommodation, Bielich argues that summary judgment should only be granted where the proposed accommodations are either clearly inefficient or outlandishly costly. (Id. at 14-15.)   Bielich lists six accommodations that could have been provided to her, such as notification when she was falling behind, step-by-step instructions, job restructuring, provision of better computer systems, periodic leave to attend medical appointments or recover from an "episodic manifestation," and a modified job schedule. (Id. at 15-16.)   In support of these possibilities, Bielich cites testimony from Ethicon human resources personnel that leave, and modified or flexible schedules were available to employees with mental disabilities. (Id. at 16; ECF No. 63 ¶¶ 161-62.)

In its reply brief, Ethicon points out that during each of the six conversations relied upon by Bielich to support a reasonable jury finding that she requested an accommodation, Bielich refused Ethicon's offers of help, attributed her poor performance to other factors, and stated that she was feeling fine. (ECF No. 53 at 8-9.) Ethicon notes that Bielich admits in a January 6, 2010 email that she had not previously requested any accommodations by stating that it was only "in retrospect" that she realized she needed help. (Id. at 9.)   According to Ethicon, under these circumstances, no reasonable jury could conclude that Bielich made an implicit request for an accommodation.

Ethicon also contends that no reasonable jury could conclude that any of Bielich's proposed accommodations would have allowed her to perform adequately the functions of her job, especially in light of Bielich's admission in the January 6, 2010 email that "overcommitting…is the real issue in my performance." (Id. at 9-10.) According to Ethicon, no reasonable jury could find, on this record, that Bielich's performance would have become adequate with the proposed accommodations.

### 3) Discussion and Conclusion

The undisputed facts present a close case. Ethicon admits for purposes of summary judgment that management personnel knew about Bielich's condition. It disputes only whether Bielich's communications to management regarding her condition would cause a reasonable employer to make inquiries about the possible need for an accommodation. In support of its position, Ethicon claims that Bielich told management that she was "okay," affirmatively told management that she could perform her job duties, and purposefully hid her disability from her supervisors.

The court would be prepared to conclude that no reasonable jury could find that Bielich had implicitly requested an accommodation if the record were as Ethicon represents it to be. The record, however, is not so clear. During, at least, Bielich's June 2, 2009 telephone call with Willick, her June 24, 2009 telephone call with Tai, her September 10, 2009 in-person meeting with Willick, and her December 15, 2009 in-person meeting with Tai, Bielich explicitly told Ethicon management and human resources personnel that her PMDD explained why her job performance was poor. (ECF No. 63 ¶¶ 18, 19, 29, 34, 59, 101; ECF No. 52-1 at 3-4, 8-9, 21-22.) For purposes of summary judgment, the court must accept this evidence as true. A reasonable jury might find that

these repeated and consistent disclosures would cause a reasonable employer to inquire further.

The court recognizes that the record reflects that Bielich also, at times, told her supervisors and human resources personnel that there were other reasons for her poor performance, such as "overcommitting," and that she was "feeling better" and was optimistic about her ability to do better at work. (ECF No. 52-7 at 8.)   The record reflects that Bielich feared appearing "weak" or "inadequate" at Ethicon, and that she now admits that she was "faking it" at the time. (ECF No. 63 ¶¶ 30, 34.)   This evidence does not comport with Bielich's testimony that she explicitly told Willick and Tai that her poor performance was caused by her PMDD and the medication she was taking to control it. These discrepancies will likely be highly probative to a jury deciding what Bielich actually said and whether or not Ethicon's duty to engage in the interactive process was triggered. In deciding a motion for summary judgment, however, this court must accept as true that Bielich told Willick and Tai in June 2009, and then again in September and December of that year, that she was performing poorly at work due to her medical condition and treatment.

It is undisputed that Ethicon made no further inquiry with respect to precisely how Bielich's condition or medicine was affecting her job performance.   The interactive process, at least, imposes a duty upon Ethicon to inquire further, initiate the interactive process, and determine whether accommodations were required.   The Court of Appeals for the Third Circuit recognizes that a party that fails to communicate by way of initiation or response may be acting in bad faith with respect to the interactive process. Taylor, 184 F.3d at 312.   It is undisputed that Ethicon did nothing more than refer Bielich

to the employee assistance program for counseling upon her disclosure that her poor performance at work was directly related to her PMDD, and treatment for the condition. The record reflects that an employee should be referred to the occupational health department for assessment upon notifying management that a medical condition is affecting job performance. Ethicon's referral of Bielich to the employee assistance program cannot, on this record, satisfy Ethicon's duty to inquire further and engage in the interactive process.   On this record, a reasonable jury could find that Bielich implicitly requested an accommodation and that Ethicon failed to engage in the interactive process.

          This finding is inconsequential, however, if Bielich cannot also show that accommodations existed that would have rendered her capable of performing the essential functions of her job. Stanley, 25 F.Supp.2d at 584.   This court can enter summary judgment in Ethicon's favor only if Bielich's proposed accommodations would be clearly ineffective. Walton, 168 F.3d at 670.   Again, the undisputed facts present a close case. Many of the accommodations identified by Bielich may have been already available to her, such as a flexible work schedule, and time off to see clinicians, or to recover from symptomatic episodes, because Bielich worked from home and set her own hours. (ECF No. 63 ¶ 12.)   In addition, because she was subject to sixty- and ninety-day performance plans, Bielich received many of the "reminders" and "step-by-step" lists that she now claims would be reasonable accommodations. (Id. ¶¶ 42, 46.)   Nevertheless, Bielich also identifies reassignment of marginal duties and a modified job schedule as possible accommodations. (ECF No. 51 at 15-16.)

On this record, the court cannot conclude that these proposed accommodations would be clearly ineffective.   Given that a reasonable jury could conclude that Ethicon failed to engage in the interactive process, and given that the record supports the finding that there were possible accommodations, it would be improper for the court to speculate about the kind of accommodation that might have been arrived at had Ethicon engaged in the interactive process. Taylor, 184 F.3d at 317-18.   The record does not clearly demonstrate that no accommodation could have permitted Bielich to perform the functions of her job, and for that reason entry of judgment as a matter of law in Ethicon's favor on Bielich's failure to accommodate claims would be error.

## V.  **Conclusion**

For the foregoing reasons, Ethicon's motion for summary judgment will be granted, in part.   Judgment will be entered in its favor on Counts I, II, IV, V, VI, VII, VIII, IX, X XI, XIII, XIV.   Bielich's failure to accommodate claims, asserted in Counts III and XII, survive summary judgment.

An appropriate order will be filed contemporaneously with this memorandum opinion.


Date: March 20, 2014                    BY THE COURT:


                                        /s/ *Joy Flowers Conti*
                                        Joy Flowers Conti
                                        Chief United States District Judge